**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ES TRUST, Derivatively on Behalf of ADMA BIOLOGICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ADAM S. GROSSMAN, JERROLD B. GROSSMAN, BRAD TADE, STEVEN A. ELMS, ALISON C. FINGER, LAWRENCE P. GUIHEEN, YOUNG T. KWON, and EDUARDO RENE SALAS,<br><br>Defendants,<br><br>and<br><br>ADMA BIOLOGICS, INC.,<br><br>Nominal Defendant. | Civil Action No. ____________<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff ES Trust ("Plaintiff"), by the undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant ADMA Biologics, Inc. ("ADMA" or the "Company"), its former Chief Financial Officer ("CFO"), and the members of its Board of Directors (the "Board") (collectively, the "Individual Defendants") for their breaches of fiduciary duties and violations of the federal securities laws. Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief, based upon the investigation of and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the

Company's website, a review of the securities fraud lawsuit filed against the Company and certain of its current and former officers, *Mazzarino v. ADMA Biologics, Inc., et al.*, No. 2:26-cv-06918-ES-AME (D.N.J.) (the "Securities Class Action"), transcripts of the Company's conference calls with financial analysts and investors, published news reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a stockholder derivative action brought against certain current and former directors and officers of ADMA for their breaches of fiduciary duties and violations of the federal securities laws, and other misconduct, which resulted in substantial damage to the Company and its stockholders.

2. ADMA is an end-to-end commercial biopharmaceutical company that develops, manufactures, and markets specialty biologics for the treatment of immunodeficient patients at risk for infection and others at risk for certain infectious diseases. ADMA's three United States Food and Drug Administration ("FDA") approved plasma-derived biologics are ASCENIV (an intravenous immunoglobulin product indicated for the treatment of primary humoral immunodeficiency), BIVIGAM (an intravenous immunoglobulin product), and Nabi-HB (a hepatitis B immune globulin product). ASCENIV is ADMA's flagship product, generating $362.5 million of the Company's $510.2 million in fiscal year 2025 consolidated revenue and representing reported year-over-year growth of approximately 51%.

3. This action arises from a scheme by the Individual Defendants to materially inflate ADMA's reported revenues through: (i) channel-stuffing of ASCENIV to ADMA's distributors in exchange for rebates and extended payment terms of up to 120 days; and (ii) the concealment of a

material related-party distribution arrangement between ADMA and Genesis BioPharma Services ("Genesis Bio"), an entity controlled by ADMA's Vice Chairman and co-founder, Defendant Jerrold B. Grossman ("J. Grossman"), father of ADMA's Chief Executive Officer ("CEO") and co-founder, Defendant Adam S. Grossman ("A. Grossman"). Genesis Bio operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings, yet has never been disclosed as a related party in any of ADMA's SEC filings, in violation of Item 404 of Regulation S-K and ADMA's Code of Ethics and Business Conduct Standards ("Code of Conduct").

4. Beginning in mid-summer 2025, the Individual Defendants caused or allowed ADMA to induce its distributors to accept excess ASCENIV inventory beyond genuine end-market demand in exchange for rebates and extended payment terms. Two distributors, BioCare, Inc. and Priority Healthcare Distribution, Inc. ("CuraScript"), accounted for approximately 73% of ADMA's consolidated revenues and 87% of ADMA's consolidated accounts receivable at year-end 2025. As a result of the channel-stuffing scheme, at least one of ADMA's two largest distributors was carrying 4 to 6 months of ASCENIV inventory on hand, compared to the approximately 30-day inventory the distributor had previously maintained under ordinary business conditions. As of December 31, 2025, ADMA's days sales outstanding ("DSO") had expanded to 113 days, compared to 43 days at the end of the prior fiscal year, meaning that at year-end 2025 ADMA carried more than a full quarter of unpaid receivables on its balance sheet.

5. In addition to the channel-stuffing scheme, the Individual Defendants caused or allowed ADMA to distribute ASCENIV through Genesis Bio, an entity that self-describes as a "life sciences logistics provider" and that operates out of ADMA's own corporate headquarters. Genesis Bio is controlled by J. Grossman, who is the founder and CEO of Technomed, Inc.,

("Technomed"), a wholesaler of specialty biological and pharmaceutical products of which Genesis Bio publicly describes itself as a "division." Notwithstanding the material nature of this relationship, ADMA has never disclosed its distribution arrangement with Genesis Bio in any of its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, or its proxy statements. Tellingly, ADMA has disclosed its historical purchases of blood collection and processing equipment from GenesisBPS, a similarly named but distinct entity founded by J. Grossman that was acquired by GSI Group in October 2025, but omitted disclosure of the related-party distribution arrangement with Genesis Bio.

6. In furtherance of the scheme, and to conceal its existence from investors and stockholders, the Individual Defendants, between August 8, 2024, and March 25, 2026 (the "Relevant Period"), made or allowed the dissemination of materially false and misleading statements in public filings and statements concerning ADMA's financial condition, revenue growth, and distribution operations. The false and misleading statements presented ADMA's reported ASCENIV revenue growth as the product of genuine end-market demand rather than the product of channel-stuffing, and omitted any disclosure of the related-party distribution arrangement with Genesis Bio. The Individual Defendants further allowed the Company to use the inflated ASCENIV revenue growth to reaffirm and progressively raise the Company's revenue guidance, including representations that ADMA was on track to achieve $1 billion or more in annual revenue prior to 2030.

7. On March 24, 2026, Culper Research issued a report (the "Culper Report") that characterized ADMA's reported revenue growth as "a fiction driven more than entirely by a de facto channel stuffing scheme and an undisclosed related party distributor." The Culper Report concluded that "absent channel stuffing, ADMA revenues declined 3% in 2025 vs. +20%

reported," and that the "ASCENIV growth story is already over, and ADMA shares are headed lower." Drawing on ADMA's own public filings, the Culper Report identified several objective indicators of channel stuffing, including the expansion of ADMA's DSO from 43 to 113 days; a $121 million gap between third-party ASCENIV provider sales data and ADMA's reported ASCENIV revenues for 2025; and cash from operations of only approximately $50 million despite reported Adjusted EBITDA of $231 million. The Culper Report further identified ADMA's undisclosed distribution relationship with Genesis Bio.

8. Following the disclosures in the Culper Report, ADMA's common stock price fell by more than 16% on March 24, 2026. On March 25, 2026, ADMA issued a press release addressing the Culper Report but declining to respond to the specific allegations of channel stuffing or the undisclosed related-party distribution arrangement with Genesis Bio. Later that day, ADMA's common stock price fell an additional 15%. On March 26, 2026, Cantor Fitzgerald downgraded ADMA stock from Overweight to Neutral, citing concerns raised by the Culper Report and ADMA's failure to respond to those concerns with specificity, and ADMA's common stock price fell an additional 13.9%, an approximately 45% cumulative decline over three trading days.

9. However, not all stockholders were equally affected. While ADMA's stock was artificially inflated by the misconduct alleged herein, six of the Individual Defendants collectively sold more than 1.6 million ADMA shares for aggregate proceeds of more than $30 million. Further, Defendant A. Grossman pledged 712,326 shares, valued at the time at $12.8 million, as collateral under a Secured Margin Line of Credit Agreement dated January 2, 2025, securing an undisclosed personal credit facility.

10. Also while ADMA's stock was artificially inflated, the Individual Defendants caused ADMA to repurchase 8,673,226 shares of its own common stock for aggregate consideration of approximately $142.3 million, including through a March 2, 2026 accelerated share repurchase agreement under which ADMA committed an additional $125.0 million of Company funds, only three weeks before the Culper Report exposed the misconduct alleged herein. Notably, the agreement was reached with JPMorgan Chase Bank, N.A. ("JPMorgan"), the entity that Defendant A. Grossman secured a loan with by putting up $12.8 million of ADMA stock as collateral.

11. On June 10, 2026, the Securities Class Action was filed in this Court against ADMA, A. Grossman, J. Grossman, and former CFO Brad L. Tade ("Tade"), asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons and entities that purchased or otherwise acquired ADMA securities between August 9, 2024 and March 25, 2026, inclusive. As a result, the Company will incur substantial costs defending itself and its officers in the Securities Class Action and faces further substantial costs in the event of an adverse judgment or settlement.

12. Plaintiff did not make a demand on the Board to institute this action because, as set forth below, such a demand would be futile. The Individual Defendants are neither disinterested nor independent. Absent this action, ADMA will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II. JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 14(a) of the Securities

Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b) and 15 U.S.C. §78n(a), respectively), and SEC Rules 10b-5 and 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. This Court has jurisdiction over each Defendant because ADMA maintains its headquarters and does substantial business in this District, and, as such, each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice, and because the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the facilities of the national securities markets located in this District, in connection with the acts alleged herein.

15. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), where the Company maintains its headquarters.

## III. THE PARTIES

### A. Plaintiff

17. Plaintiff ES Trust ("Plaintiff") purchased ADMA stock on June 16, 2025, and November 17, 2025, has been at all relevant times a stockholder of ADMA, and was a stockholder at the time of the transactions complained of herein. Plaintiff will adequately and fairly represent the interests of ADMA in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

### B. Defendants

#### 1. Nominal Defendant

18. Nominal Defendant ADMA Biologics, Inc. is a Delaware corporation with its principal executive offices located at 465 State Route 17, Ramsey, New Jersey 07446. ADMA's common stock trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "ADMA."

#### 2. Individual Defendants

19. Defendant A. Grossman co-founded the Company and has served as ADMA's President, CEO, and as a director since October 2011. A. Grossman previously served as ADMA's President and Chief Operating Officer from 2007 to October 2011 and as the Company's Interim CFO from April 2024 to July 2024. A. Grossman is the son of Defendant Jerrold B. Grossman, ADMA's Vice Chairman and co-founder. A. Grossman is the managing member of Hariden, LLC ("Hariden"), an entity entitled under a February 2012 stockholders agreement to designate one nominee to the Board, the seat currently occupied by his father, Defendant J. Grossman. A. Grossman is a named defendant in the Securities Class Action. Since fiscal year 2023, A. Grossman received the following compensation from ADMA:

| YEAR | SALARY | BONUS | STOCK AWARDS | OPTION AWARDS | NON-EQUITY INCENTIVE | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|---|---|
| 2023 | $750,000 | $793,125 | $1,921,878 | $2,527,844 | N/A | $46,802 | $6,039,649 |
| 2024 | $800,000 | N/A | $3,011,731 | $3,042,274 | $1,020,000 | $44,729 | $7,918,734 |
| 2025 | $925,000 | N/A | $4,049,994 | $4,049,998 | $1,156,250 | $56,084 | $10,237,326 |

20. Defendant J. Grossman co-founded the Company, and has served as a director since 2007 and as Vice Chairman of the Board. J. Grossman previously served as ADMA's CEO on a part-time basis between 2007 and October 2011. J. Grossman is the father of Defendant A. Grossman, ADMA's President and CEO. As alleged more fully in Section V.B, *infra*, J. Grossman is the designated nominee of Hariden (an entity controlled by his son) and controls or has

controlled additional entities that transact business with ADMA, including Genesis Bio, Technomed, Areth, and (until its acquisition by GSI Group in October 2025) GenesisBPS. J. Grossman is a named defendant in the Securities Class Action. Since fiscal year 2023, J. Grossman received the following compensation from ADMA:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2023 | $90,000 | $86,480 | $108,236 | $284,716 |
| 2024 | $90,000 | $129,816 | $124,583 | $344,399 |
| 2025 | $90,000 | $174,986 | $174,999 | $439,985 |

21. Defendant Tade served as ADMA's CFO and Treasurer from July 24, 2024 until February 25, 2026. Prior to being promoted to CFO, Tade served as ADMA's Vice President, Financial Operations from June 2023 to July 24, 2024. On February 20, 2026, Tade notified the Company that he was retiring effective at the close of business on February 25, 2026. Tade transitioned to a consulting role with the Company through July 31, 2026, receiving monthly consulting payments of $41,666.67. Tade is a named defendant in the Securities Class Action. Since fiscal year 2024, Tade received the following compensation from ADMA:

| YEAR | SALARY | BONUS | STOCK AWARDS | OPTION AWARDS | NON-EQUITY INCENTIVE | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|---|---|
| 2024 | $374,792 | N/A | $1,253,192 | $1,002,292 | $254,475 | $51,684 | $2,936,435 |
| 2025 | $500,000 | N/A | $999,988 | $999,997 | $250,000 | $73,645 | $2,823,630 |

22. Defendant Steven A. Elms ("Elms") has served as a director of ADMA since 2007 and as Chairman of the Board since 2012. Elms is a member of the Governance and Nominations Committee. Elms is the designated nominee of Aisling Capital, where he serves as Managing Partner. Since fiscal year 2023, Elms received the following compensation from ADMA:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2023 | $95,500 | $86,480 | $108,236 | $290,216 |
| 2024 | $96,777 | $129,816 | $124,583 | $351,176 |
| 2025 | $96,250 | $174,986 | $174,999 | $446,235 |

23. Defendant Alison C. Finger ("Finger") has served as a director of ADMA since September 2023. Finger is a member of the Compensation Committee and the Governance and Nominations Committee. Since fiscal year 2023, Finger received the following compensation from ADMA:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2023 | $12,500 | N/A | $218,616 | $231,116 |
| 2024 | $51,578 | $129,816 | $124,583 | $305,977 |
| 2025 | $66,250 | $174,986 | $174,999 | $416,235 |

24. Defendant Lawrence P. Guiheen ("Guiheen") has served as a director of ADMA since July 2012. Guiheen is the Chair of the Governance and Nominations Committee and a member of the Audit Committee and the Compensation Committee. Since fiscal year 2023, Guiheen received the following compensation from ADMA:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2023 | $80,375 | $86,480 | $108,236 | $275,091 |
| 2024 | $80,375 | $129,816 | $124,583 | $334,774 |
| 2025 | $85,000 | $174,986 | $174,999 | $434,985 |

25. Defendant Young T. Kwon, Ph.D. ("Kwon") has served as a director of ADMA since October 2021. Kwon is the Chair of the Audit Committee and the Chair of the Compensation Committee. Since fiscal year 2023, Kwon received the following compensation from ADMA:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2023 | $77,625 | $86,480 | $108,236 | $272,341 |
| 2024 | $78,841 | $129,816 | $124,583 | $333,240 |
| 2025 | $95,000 | $174,986 | $174,999 | $444,985 |

26. Defendant Eduardo Rene Salas ("Salas") has served as a director of ADMA since December 2024. Salas is a member of the Audit Committee. Since fiscal year 2024, Salas received the following compensation from ADMA:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OPTION AWARDS | TOTAL |
|---|---|---|---|---|
| 2024 | N/A | N/A | $214,537 | $214,537 |
| 2025 | $62,500 | $174,986 | $174,999 | $412,485 |

27. Defendants A. Grossman, J. Grossman, Tade, Elms, Finger, Guiheen, Kwon, and Salas are referred to as the "Individual Defendants." Defendants A. Grossman, J. Grossman, Tade, Elms, Guiheen, and Kwon are collectively referred to as the "Insider Seller Defendants."

## IV. INDIVIDUAL DEFENDANTS' DUTIES

28. By reason of their positions as officers or directors of ADMA and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe ADMA and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee ADMA in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ADMA and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

29. The Individual Defendants, because of their positions of control and authority as directors and officers of ADMA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30. As officers and directors of a publicly traded company whose common stock was registered with the SEC and trades on Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning ADMA's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to

exercise reasonable control and supervision over ADMA's management, policies, and internal controls.

31. At all times relevant hereto, the Individual Defendants were the agents of each other and ADMA and were always acting within the course and scope of such agency.

32. The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at ADMA.

**A. Duties Under ADMA's Code Of Ethics And Business Conduct**

33. The Board has adopted a Code of Conduct which applies to all ADMA directors, officers, and employees. The Code of Conduct states that the Board adopted it in order to, among other things:

- promote honest and ethical business conduct, including the ethical handling of potential conflicts of interest;
- promote full, fair, and accurate disclosures in information provided to governmental agencies and made in public communications;
- promote compliance with governmental laws, rules, and regulations;
- promote the protection of Company assets, including corporate opportunities and confidential information;
- promote ethical conduct and prudent use of corporate resources to provide long-term financial value to stockholders;
- promote fair dealing by the Company;
- deter wrongdoing by covered persons; and
- ensure accountability for adherence to this Code of Conduct.

34. The Code of Conduct addresses conflicts of interest, providing:

> Covered persons should always act in the best interest of ADMA, and not permit outside interests to interfere with their job duties. ADMA prohibits all employees from using their position with the Company or the Company's relationship with its clients, customers, vendors, suppliers, or contractors for private gain and/or to obtain benefits for themselves or members of their family.

35. The Code of Conduct further provides:

> A director, officer, or employee shall have an indirect interest in a proposed transaction if: the other party to the transaction is related to the director, officer, or employee; the other party is an entity in which the director, officer, or employee has a material financial interest; or the director, officer or employee is an officer, director or general partner of such other party.

36. The Code of Conduct provides that "[a]ny transactions involving a potential conflict of interest for an officer or director must be cleared in writing by the Board."

37. The Code of Conduct addresses corporate opportunities, providing:

> Covered persons owe a duty to the Company to advance the Company's legitimate interests whenever the opportunity to do so arises. Covered persons should not take for themselves opportunities that arise or are discovered due to their position with the Company or through the use of Company assets or information. Use of the Company's assets, information or one's position for personal gain, or personally competing with the Company, is not permitted.

38. The Code of Conduct prohibits insider trading:

> Since ADMA is publicly-owned, the Company is legally obligated to vigilantly safeguard its Material Nonpublic Information (as defined in the Company's Insider Trading Policy) from improper disclosure. Under the federal securities laws, it is unlawful for all persons in possession of Material Nonpublic Information about the Company, including our directors, officers and employees and the Company itself and its subsidiaries, to (i) buy or sell ADMA securities, (ii) improperly disclose or give Material Nonpublic Information to others who may trade on the basis of that information, or (iii) advise others how to trade while in possession of Material Nonpublic Information.

39. The Code of Conduct requires accurate and honest financial reporting:

> The Company's books, records, and accounts shall accurately and fairly reflect the Company's transactions and the disposition of its assets. Compliance with accepted accounting rules and controls is expected at all times. . . . Falsifying records or failing to record transactions is a severe offense and will result in Company discipline, loss of employment and/or legal recourse.

40. The Code of Conduct further provides:

> ADMA is a publicly-traded company that is obligated to record and report many business transactions. Information contained in Company records may be provided to stockholders, investors, regulators, and government agencies. For this reason, the Company's accounting records must conform to the Company's internal control and disclosure procedures, as well as generally accepted accounting principles,

> laws, and regulations. The Company's filings with the SEC must be full, fair, accurate, and timely, and include legally-mandated disclosures.

41. The Code of Conduct also provides that "[t]he Audit Committee of the Board is responsible for ensuring that every covered person can confidentially report any concerns related to the Company's financial statements, reports, or transactions."

**B. Additional Duties Of Audit Committee Members**

42. Defendants Kwon, Guiheen, and Salas served as members of the Audit Committee during the Relevant Period. Kwon served as Chair of the Audit Committee. In addition to the duties owed by all directors, members of the Audit Committee owed additional duties to ADMA pursuant to the Audit Committee Charter (the "Audit Committee Charter").

43. The Audit Committee Charter provides that the primary purpose of the Audit Committee is to assist the Board in overseeing the accounting and financial reporting processes of the Company, and provides that the Audit Committee assists the Board in connection with, among other things:

> (a) reviewing the financial reports and other financial information prepared by the Company for submission to any governmental or regulatory body or the public and monitoring the integrity of such financial reports; (b) reviewing the Company's systems of internal controls established for finance, accounting, legal compliance and ethics; (c) reviewing the Company's accounting and financial reporting processes generally and the audits of the financial statements of the Company; (d) monitoring compliance with legal regulatory requirements; [and] (e) monitoring the engagement, qualifications, independence and performance of the Company's registered independent public accounting firm . . . .

44. The Audit Committee Charter requires the Audit Committee to "[r]eview with management and the registered independent public accounting firm the audited financial statements and related footnotes and the clarity of the disclosures in the financial statements, including a review of major issues regarding accounting and auditing principles and practices and

any related-party transactions as well as the adequacy of internal controls that could significantly affect the Company's financial statements."

45. The Audit Committee Charter further requires the Audit Committee to "[e]stablish and review related party transaction policies and review and approve any transactions between the Company and related parties."

46. The Audit Committee Charter also requires the Audit Committee to "[m]eet periodically with management and the registered independent public accounting firm to review the Company's major financial risk exposures and the steps taken to monitor and control such exposures" and to "[o]versee the Company's risk management policies and practices and update the full Board on a periodic basis as to the adequacy of the Company's policies and procedures in the risk and control environment."

47. The Audit Committee Charter further requires the Audit Committee to "[r]eview disclosures made to the Committee by the Company's Principal Executive Officer and Principal Financial Officer about any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls."

**C. Additional Duties Of Governance And Nominations Committee Members**

48. Defendants Guiheen, Elms, and Finger served as members of the Governance and Nominations Committee during the Relevant Period. Guiheen served as Chair of the Governance and Nominations Committee. In addition to the duties owed by all directors, members of the Governance and Nominations Committee owed additional duties to ADMA pursuant to the Governance and Nominations Committee Charter (the "Governance Committee Charter").

49. The Governance Committee Charter provides that the purpose of the Governance and Nominations Committee is, among other things, to "develop and recommend to the Board a set of corporate governance principles and a code of conduct applicable to the Company" and to "oversee the evaluation of the Board through annual assessment by the Committee of the performance of each member of the Board."

## V. SUBSTANTIVE ALLEGATIONS

### A. Company Background

50. ADMA was co-founded by Defendants A. Grossman and J. Grossman in 2007 and completed its initial public offering in 2013. Since its founding, ADMA has grown into a specialty biopharmaceutical company with reported fiscal year 2025 consolidated revenue of $510.2 million, of which $362.5 million was attributable to sales of ADMA's flagship product, ASCENIV. ADMA does not sell its products directly to healthcare providers or to patients. Instead, ADMA distributes its products through independent third-party specialty distributors. For the year ended December 31, 2025, two of those distributors, BioCare and CuraScript, accounted for approximately 73% of ADMA's consolidated revenues and 87% of ADMA's consolidated accounts receivable. The distribution model that ADMA uses, and the concentration of ADMA's revenues among a small number of distributors, are the operational context in which the channel-stuffing scheme alleged herein was executed.

### B. Defendants A. Grossman And J. Grossman Control The Company

51. Defendants A. Grossman and J. Grossman are father and son. A. Grossman has served as ADMA's President and CEO and as a director since October 2011. J. Grossman has served as ADMA's Vice Chairman and as a director since 2007. Together, the Grossmans have effectively controlled the Company since its inception. In addition to their positions at ADMA, the

Grossmans control a network of related entities that transact business with ADMA or otherwise have material relationships with the Company. Certain of those relationships are disclosed in ADMA's public filings, while others, including the material related-party distribution arrangement between ADMA and Genesis Bio that is at the heart of this action, are not.

52. A. Grossman is the managing member of Hariden, an entity that beneficially owned 580,957 shares of ADMA common stock as of March 31, 2026. Pursuant to a February 2012 stockholders agreement, Hariden is entitled to designate one nominee to ADMA's Board of Directors for so long as Hariden owns 50% of the shares of common stock it owned immediately following the closing of that agreement. Hariden's designee is J. Grossman.

53. Further, A. Grossman and J. Grossman jointly control Areth, LLC ("Areth"). Areth beneficially owned 1,143,426 shares of ADMA common stock as of March 31, 2026. ADMA and Areth have entered into a Shared Services Agreement, as amended from time to time, under which ADMA occupies approximately 4,200 square feet of office space at its headquarters, together with warehouse space and certain related services provided by Areth to ADMA. As disclosed in ADMA's definitive proxy statement filed on April 15, 2026 (the "2026 Proxy"), ADMA paid Areth $120,000 under the Shared Services Agreement for the year ended December 31, 2025. Effective October 1, 2022, ADMA and Areth extended the term of the lease to December 31, 2026 at the current monthly rent, with the agreement automatically renewing for successive one-year periods thereafter unless either party terminates the agreement with twelve months' prior written notice.

54. Moreover, J. Grossman is the founder and CEO of Technomed, a wholesaler of specialty biological and pharmaceutical products that has operated since 1980. Genesis Bio, an undisclosed related-party distributor, publicly describes itself as "a division of Technomed Inc."

Genesis Bio also operates out of the same address as ADMA's corporate headquarters. ADMA has never disclosed Genesis Bio as a related entity, an entity controlled by J. Grossman that operates out of the same address as ADMA's corporate headquarters and that publicly lists ASCENIV among its product offerings.

55. Additionally, until October 2025, J. Grossman was the founder and President of GenesisBPS, a medical device firm specializing in blood collection and processing equipment. ADMA disclosed in its public filings, including in its April 15, 2025 definitive proxy statement (the "2025 Proxy"), that it had historically purchased blood collection and processing equipment from GenesisBPS. GSI Group acquired GenesisBPS in October 2025.

56. ADMA has publicly represented to investors that its business depends materially on A. Grossman's continued service. As disclosed in ADMA's Annual Report on Form 10-K for the fiscal year ended December 31, 2025 (the "2025 10-K"):

> Our performance is substantially dependent on the continued service and performance of our management team, who have extensive experience and specialized expertise in our business. In particular, the loss of Adam S. Grossman, our President and Chief Executive Officer, could adversely affect our business and operating results.

**C. The Scheme To Inflate ADMA's Reported Revenues**

57. Beginning no later than mid-2025, ADMA induced its distributors to accept excess ASCENIV inventory by offering rebates and extended payment terms as long as 120 days. The Company then booked as revenue sales of product that had been pushed to distributors but for which there was no corresponding end-market demand. As a result, ADMA reported that ASCENIV revenues grew from approximately $92.6 million in fiscal year 2023 to $362.5 million in fiscal year 2025. In reality, and as later revealed by the Culper Report, absent the channel-stuffing scheme, ADMA's total revenues would have declined by approximately 3% in fiscal year 2025 rather than growing by approximately 20%, as publicly reported by the Company.

58. ADMA distributes ASCENIV through Genesis Bio, an entity controlled by Defendant J. Grossman. Notwithstanding this material related-party distribution relationship, ADMA has never disclosed sales to, or the existence of a distribution arrangement with, Genesis Bio in any of its periodic reports filed with the SEC. Instead, ADMA has selectively disclosed only its *de minimis* purchases from the similarly named but distinct GenesisBPS, another Grossman-controlled entity, while omitting disclosure of ADMA's sales to Genesis Bio.

59. On October 9, 2024, ADMA filed a Current Report on Form 8-K disclosing that its longtime independent registered public accounting firm, CohnReznick LLP ("CohnReznick"), had notified the Company's Audit Committee on October 3, 2024 that it would resign as ADMA's independent registered public accounting firm effective upon the filing of the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2024.[1] CohnReznick's resignation subsequently became effective on November 7, 2024, when ADMA filed that Form 10-Q.

60. As ADMA itself disclosed, CohnReznick's decision to resign was made without the Company's involvement: "CohnReznick is not required to obtain, and did not seek, the Company's consent to its decision to resign as the Company's independent registered public accounting firm. As a result, neither the Board nor the Audit Committee took part in CohnReznick's decision to provide its notice of resignation."[2]

61. On October 31, 2024, the Company engaged KPMG LLP ("KPMG") as its new independent registered public accounting firm. KPMG flagged critical audit matters in both fiscal years 2024 and 2025. Approximately one month after CohnReznick's resignation, long-time

---

[1] ADMA Biologics, Inc., Current Report (Form 8-K), Item 4.01 (Oct. 9, 2024).

[2] *Id.*

director Bryant E. Fong — who had served on ADMA's Board since prior to the Company's 2013 initial public offering — resigned. In connection with his resignation, the Board approved the immediate vesting of Fong's unvested restricted stock units. On February 20, 2026, Tade notified the Company that he was retiring effective at the close of business on February 25, 2026 following the filing of the 2025 10-K. Tade transitioned to a consulting role with the Company through July 31, 2026, receiving monthly payments of $41,666.67. Tade was immediately succeeded by Paul Terence Kohler, Jr. ("Kohler"), the Company's former Executive Financial Advisor, effective February 26, 2026.

### D. ADMA And Its Directors And Officers Misrepresented The Company's Financial Growth

62. On August 8, 2024, ADMA filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was accompanied by certifications signed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants A. Grossman and Tade attesting to the accuracy of the financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The Q2 2024 10-Q reported total revenues of $107.2 million for the quarter ended June 30, 2024, representing approximately 78% year-over-year growth, with the increase attributed primarily to increased sales of ASCENIV. The Q2 2024 10-Q disclosed the following regarding related-party transactions:

> During the six months ended June 30, 2024 and 2023, the Company purchased certain specialized medical equipment and services primarily related to the Company's plasma collection centers, as well as personal protective equipment, from GenesisBPS and its affiliates ("Genesis"), aggregating to $0.1 million and $0.2 million, respectively. Genesis is owned by Dr. Grossman and Mr. Grossman.

63. On the same day, on a conference call with financial analysts and investors to discuss the 2Q 2024 financial results, Defendant A. Grossman touted the Company's financial

results and noted that, based on "current market conditions, we now anticipate generating total revenue of more than $400 million for 2024 and $445 million for 2025." A. Grossman represented that the Company's confidence in achieving its financial targets is "underpinned by the rapid and continuous growth of our unique and proprietary immunoglobulin, ASCENIV" and emphasized that both "the breadth and depth of ASCENIV's prescriber base continues to strengthen." He also reported that "ASCENIV has now surpassed a 50% contribution to ADMA's total revenue, marking a significant milestone for our company and setting the stage for further anticipated favorable mix shifts." Due to the "growing demand," A. Grossman reported that the Company was "continuing to shift production capacity towards ASCENIV."

64. Defendant A. Grossman represented that the Company was confident that "the incremental additional penetration with ASCENIV will accelerate near-term revenue and create substantial peak revenue opportunity beyond our 2025 guided baseline." He concluded that "[l]ooking beyond 2025, we plan on leveraging our innovative commercial model, specialty manufacturing and R&D platform to unlock a potential peak revenue and earnings opportunity reaching levels, which may be multifold higher than our currently provided financial guidance."

65. CFO Tade emphasized the total revenues of $107.2 million for the quarter as compared to $60.1 million in the second quarter of 2023, a 78% increase year-over-year, and noted that the increase was due in part "to the rapid growth of commercial product revenue" during the second quarter. Tade stated that the strength of ADMA's "underlying business trends are such that we are confident in our ability to build on this newly established financial baseline and grow both revenue and earnings in the periods ahead."

66. On November 7, 2024, ADMA filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q was

accompanied by SOX certifications signed by Defendants A. Grossman and Tade attesting to the accuracy of the financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The Q3 2024 10-Q reported total revenues of $119.8 million for the quarter ended September 30, 2024, representing approximately 78% year-over-year growth, with the increase attributed primarily to increased sales of ASCENIV. The Q3 2024 10-Q disclosed the following regarding related-party transactions:

> During the nine months ended September 30, 2024 and 2023, the Company purchased certain specialized medical equipment and services primarily related to the Company's plasma collection centers, as well as personal protective equipment, from GenesisBPS and its affiliates ("Genesis"), aggregating to $0.2 million and $0.4 million, respectively. Genesis is owned by Dr. Grossman and Mr. Grossman.

67. On the same day, on a conference call with financial analysts and investors to discuss the Q3 2024 financial results, A. Grossman touted the $119.9 million in total revenue and the Company's achievement of "sequential growth" from its second quarter financial baseline, "both in revenue and earnings, further solidifying [its] position as one of the fastest growing and profitable companies in the biotech sector." Based on the reported growth, he confirmed that total revenues would exceed $415 million in 2024 and $465 million in 2025 with significant margin expansion "driven by an ongoing revenue shift towards ASCENIV," which he represented was emerging as a "as a potential billion dollar revenue opportunity" with "substantial growth headroom and branded durability potentially extending thereafter through the 2030s and beyond." Based on this growing demand, the Company was "strategically adjusting" its production schedule to provide "for greater ASCENIV production throughput" and as a result, anticipated "an accelerating pace of earnings growth."

68. Defendant Tade confirmed the Company's anticipated revenue growth: "As we expect to finish 2024 from a position of strength, we believe we are just beginning to generate

financial results that demonstrate the distinct operating leverage that our business can realize if our revenue continues to grow as planned and fixed expenses are tightly managed."

69. A. Grossman later emphasized the Company's ability to unlock revenue and earnings opportunities and hit a $1 billion annual revenue milestone by 2030:

> Our commitment to innovation and performance continues to drive substantial growth and value creation which we believe positions ADMA for both near term and long-term success. We expect to finish 2024 on a high note and embark on 2025 from a position of significant strength. In the periods ahead, we anticipate delivering sustained revenue growth and continuing to drive a favorable shift in our revenue mix and production schedule towards ASCENIV. We believe this would result in significant margin expansion and earnings growth.
>
> We are confident our strong balance sheet allows us to be capable stewards of stockholder capital and maximize equity value while supporting our rapid growth trajectory.
>
> Looking beyond 2025, we aim to leverage our innovative commercial model, agile specialty biologics production platform and in house R&D engine to unlock revenue and earnings opportunities that could significantly exceed our current projections. The collective impact of our internal donor retention programs and third party high tighter plasma supply initiatives, ***positions us to potentially reach a $1 billion annual revenue milestone as rapidly as possible, with further growth opportunities extending thereafter.***[3]

70. When an analyst questioned the $1 billion revenue figure, Defendant A. Grossman again emphasized the demand for ASCENIV, noting that, "[c]ertainly in the back half of '25, we expect to see accelerating revenue and certainly margin accretion," and that "ASCENIV is the majority of our revenue. It continues to grow."

71. On March 3, 2025, the Company filed with the SEC a Current Report on Form 8-K and attached a press release announcing its fourth quarter and full year financial results, including $117.5 million in total revenue for the fourth quarter as compared to $73.9 million for the same period in the prior year, an increase of 59%, and 2024 total revenue of $426.5 million, a

[3] All emphasis is added unless otherwise noted.

65% year-over-year increase over the prior year's $258.2 million. ADMA also provided fiscal 2025 and 2026 total revenue guidance of more than $490 million and $605 million, respectively.

72. On the same day, in a conference call with financial analysts and investors, A. Grossman touted the Company's "commitment to financial and operational excellence" that continued "to drive strong performance, allowing us to once again revise our financial guidance upwards." He emphasized that the Company expected "continued margin expansion as our revenue mix shifts towards [ASCENIV], which we believe represents a potential billion-dollar-or-more opportunity, with lasting growth and brand durability through at least 2035 and likely beyond."

73. A. Grossman further touted the Company's "third-party supply contracts" that combined with "the robust internal plasma collection trends, are expected to sustain Asceniv's revenue growth and position us to potentially exceed $1 billion in total annual revenue prior to 2030, with anticipated growth headroom thereafter." He represented that "the anticipated increase in available high-titer plasma supply will enable us to meet Asceniv's growing demand in the coming quarters, accelerate revenue and earnings growth, and further build on [ASCENIV's] still-developing growth curve."

74. A. Grossman confirmed the Company's ability to meet $1 billion in total annual revenue prior to 2030. Grossman later stated that ADMA is "[p]ositioned for anticipated both near and long-term success, we are focused on sustaining revenue growth, expanding margins, and accelerating earnings throughout 2025 and beyond," noting that ADMA's "strong balance sheet, growing net cash position, and robust intellectual property estate provide the financial strength and flexibility to support this trajectory while ensuring reliable access to our life-saving biologic therapies." He concluded that ADMA's "strategic focus on donor retention, third-party plasma procurement partnerships, and scalable production capabilities" supported its "expected path

toward a $1 billion-plus revenue milestone as rapidly as possible, positioning" the Company "to meet growing demand while creating lasting value for patients, providers, and stockholders."

75. On that day, the Company filed with the SEC a Form 12b-25 reporting that it would be unable to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2024 because its prior auditor, CohnReznick, had resigned, and the Company "required additional time to test and document the Company's controls associated with its use of and reliance upon certain third-party service providers and to complete its assessment of the effectiveness of internal control over financial reporting as of December 31, 2024." Consequently, the Company's new auditor, KPMG, had "not yet completed its audit procedures."

76. On March 18, 2025, ADMA filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 10-K"). The 2024 10-K was signed by the Individual Defendants. The 2024 10-K was accompanied by SOX certifications signed by Defendants A. Grossman and Tade attesting to the accuracy of the financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The 2024 10-K confirmed the $462.5 million in total revenues for the fiscal year ended December 31, 2024, with the growth attributed primarily to increased sales of ASCENIV.

77. The 2024 10-K represented that ADMA's disclosure controls and procedures were effective:

> Based on the evaluation of our disclosure controls and procedures as of December 31, 2024, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

78. The 2024 10-K disclosed the following regarding related-party transactions:

> During the years ended December 31, 2024, 2023 and 2022, the Company purchased certain specialized equipment and repair services used for the collection

> and processing of source plasma from GenesisBPS and its affiliates ("Genesis") in the amount of $0.2 million, $0.4 million and $0.2 million, respectively. Genesis is owned by Dr. Grossman and Adam Grossman.

79. The 2024 10-K also represented the following regarding revenue recognition:

> Product revenue is recognized when the customer is deemed to have control over the product and the performance obligation is satisfied. Control is determined based on when the product is shipped or delivered and title passes to the customer. Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance.

80. On May 7, 2025, ADMA filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q was accompanied by SOX certifications signed by Defendants A. Grossman and Tade. The Q1 2025 10-Q reported total revenues of $114.8 million for the quarter ended March 31, 2025, representing approximately 40% year-over-year growth, with the increase attributed primarily to increased sales of ASCENIV. The Q1 2025 10-Q attested that ADMA's disclosure controls and procedures were effective:

> Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of March 31, 2025 were effective to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures.

81. The Q1 2025 10-Q also disclosed the following regarding related-party transactions:

> During the three months ended March 31, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS in the amount of $34 thousand and $0.1 million, respectively. Genesis is owned by Dr. Grossman and Adam Grossman.

82. On the same day, on a conference call with financial analysts and investors to discuss the Q1 2025 financial results, Defendant A. Grossman touted the $114.8 million total revenues for the quarter, noting that the Company was increasing its total revenue guidance to $500 million or more for 2025 and $625 million or more for 2026. He further emphasized that "recent expansions in both third party and internal high titer plasma supply have markedly de risked our growth trajectories and enhanced our visibility for continued revenue growth and margin expansion." A. Grossman again expressed confidence in the Company's "ultimate ability" to reach $1 billion in annual revenues by 2030.

83. CFO Tade attributed the increased total revenue to sales of ASCENIV, "as we continue to experience increased acceptance and utilization by physicians, payers, and patients for this product." Tade represented that the Company "continued to opportunistically and strategically increase medical education and promotion activities during the first quarter in advance of anticipated increases in high titer plasma supply provided by the recently secured long term supply agreements, supporting [ASCENIV's] revenue growth trajectory."

84. A. Grossman later highlighted the Company's ability to unlock "potential opportunities for accelerated revenue and earnings growth," stating that the Company was confident in its ability to "achieve sustainable revenue and earnings growth."

85. On August 6, 2025, ADMA filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q reported total revenues of $122.0 million for the quarter ended June 30, 2025, representing approximately 14% year-over-year growth, with the increase attributed primarily to continued adoption and utilization of ASCENIV. The Q2 2025 10-Q was accompanied by SOX certifications signed by Defendants

A. Grossman and Tade again attesting that ADMA's disclosure controls and procedures were effective:

> Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of June 30, 2025, were effective to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures.

86. The Q2 2025 10-Q disclosed the following regarding related-party transactions:

> During the six months ended June 30, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS in the amount of $0.1 million. Genesis is owned by Dr. Grossman and Adam Grossman.

87. On the same day, on a conference call with financial analysts and investors to discuss the Q2 2025 financial results, A. Grossman again touted the Company's financial results and emphasized that, excluding a non-recurring $12.6 million Medicaid rebate accrual reversal, total revenue grew by approximately 29%. He also expressed confidence in the Company's ability to meet its long term growth targets, including reaching $1.1 billion in annual revenue prior to 2030.

88. Defendant Tade confirmed the Company's $500 million revenue guidance for 2025 and $625 million revenue guidance for 2026 and a revenue target of $1.1 billion by 2030. Tade concluded that ADMA was "well positioned" to accelerate its "revenue and growth and earnings growth rates in . . . 2025, grow free cash flow and continue to reduce [its] weighted average cost of capital" all of which it was "confidently executing on while concurrently advancing" its "growth initiatives."

89. A. Grossman later concluded that the Company was poised to support a "multi billion dollar revenue entity."

90. On November 5, 2025, ADMA filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2025 (the "Q3 2025 10-Q"). The Q3 2025 10-Q reported total revenues of $134.2 million for the quarter ended September 30, 2025, representing approximately 12% year-over-year growth, with the increase attributed primarily to continued adoption and utilization of ASCENIV. The Q3 2025 10-Q was accompanied by SOX certifications signed by Defendants A. Grossman and Tade attesting that ADMA's disclosure controls and procedures were effective:

> Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of September 30, 2025 were effective to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures.

91. The Q3 2025 10-Q disclosed the following regarding related-party transactions:

> During the nine months ended September 30, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS ("Genesis") in the amount of $0.2 million. Genesis was owned by Dr. Grossman and Adam Grossman until September 30, 2025.

92. On the same day, on a conference call with financial analysts and investors to discuss the Q3 2025 financial results, Defendant A. Grossman stated that the Company was positioned to achieve $1.1 billion in annual revenue in 2029:

> Looking forward, our focus remains clear: expand ASCENIV access and utilization, scale yield enhanced production and product mix shift, drive continued margin expansion, advance our capital-efficient pipeline and return capital to stockholders through share repurchases. We believe these priorities will collectively position us to achieve more than $1.1 billion in annual revenue in 2029 with a clear line of sight to durable earnings growth.

93. A. Grossman emphasized that ADMA was "generating record revenue and profitability, achieving best-in-class gross margins with substantial expansion forecasted from

here and setting the stage for what should be sustained earnings growth across the next decade while advancing a compelling new product cycle." He noted that as "payer access improves in 2026, we expect adoption to accelerate further, supporting our expectations of ***strong double-digit revenue growth well into the back half of the decade.***"

94. Defendant Tade stated that ADMA's third quarter financial results "highlight[ed] ADMA's consistent execution and expanding profitability." He noted that total revenue for 2025 was expected to be $510 million up from prior guidance of $500 million. Tade also confirmed that "[l]ooking long term, ADMA expects fiscal year 2029 total annual revenue to exceed $1.1 billion, supported by yield enhancement efficiencies, expanding ASCENIV demand and continued gross margin gains."

95. A. Grossman stated that the confidence in raising the Company's revenue guidance was based on ASCENIV utility and demand:

> [T]he confidence is that we see it in the redistribution data. I mean the product pull-through at record levels, exceeding internal expectations throughout the third quarter. Fourth quarter is no different. We feel very confident in ASCENIV's utility. I think the data that I was just speaking about, this is what physicians and patients are experiencing in the real-world setting. So we're making a good drug. We're making more of it than we ever have before. We had more product available in the third quarter than we have had historically, and we see it continuing to pull through at a rapid pace. So very encouraging. . . . I don't like to sound like a broken record, but the patients who are switching to ASCENIV are patients that are not thriving on their standard IG, and they're looking for alternatives.

96. On February 25, 2026, ADMA filed with the SEC its 2025 10-K. The 2025 10-K was signed by the Individual Defendants. The 2025 10-K was accompanied by SOX certifications signed by Defendants A. Grossman and Tade.

97. The 2025 10-K again represented that ADMA's disclosure controls and procedures were effective:

> Based on the evaluation of our disclosure controls and procedures as of December 31, 2025, our Chief Executive Officer and Chief Financial Officer concluded that,

> as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

98. The 2025 10-K disclosed the following regarding related-party transactions:

> During the years ended December 31, 2025, 2024 and 2023, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS and its affiliates . . . in the amount of $0.1 million, $0.2 million and $0.4 million, respectively. Genesis was owned by Dr. Grossman and Adam Grossman until September 30, 2025.

99. The 2025 10-K reported total revenues of $510.2 million for the fiscal year ended December 31, 2025 compared to $426.5 the prior year, representing approximately 20% year-over-year growth. The 2025 10-K further represented that ADMA received approximately $362.5 million in net revenues from ASCENIV during the fiscal year ended December 31, 2025, a 51% increase year-over-year.

100. On the same day, on a call with financial analysts and investors, Defendant A. Grossman touted the Company's full year revenues, primarily driven by ASCENIV sales:

> For full year 2025, [ASCENIV] achieved $363 million in net revenue, representing 51% year-over-year growth. Our differentiated, patent-protected specialty immune globulin exited the year at record utilization levels, driven by high demand and strong prescriber adoption. With [ASCENIV] still forecasted to be early in its penetration curve within its total addressable market, driven by broad payer access and increasing confidence in long-term supply continuity, [ASCENIV] is well positioned for sustained utilization growth throughout 2026 and beyond.
>
> ***
>
> The recent increase in working capital primarily reflects the growth in [ASCENIV] and the acceleration in revenue growth we are guiding to as we continue to make meaningful inroads into [ASCENIV's] still significantly under-penetrated addressable market. As demand builds and our McKesson distribution agreement ramps up, alongside further anticipated diversification of our distribution network, we expect improving working capital efficiency and cash conversion throughout 2026.

101. Defendant Tade confirmed that the Company's financial targets, including 2026 revenue guidance of over $635 million, were "driven by continued [ASCENIV] penetration into its addressable patient market, full realization of yield enhancement efficiencies, continued mix

improvement, and disciplined operational execution." Tade concluded that ADMA was "exceptionally well-positioned for sustained revenue growth, continued margin growth, and increasing cash generation in the years ahead." Defendant A. Grossman echoed that "ADMA has never been better positioned" and the Company was forecasting "substantial revenue growth, continued margin growth, and increasing cash generation, driven by disciplined execution across the organization."

**E. ADMA's Materially False And Misleading Proxy Statements**

102. On April 15, 2025, during the period of the misconduct alleged herein, ADMA filed its Proxy Statement with the SEC (the "2025 Proxy") soliciting stockholder votes on the following proposals, among others, the election of Defendants J. Grossman and Guiheen as directors, to serve three-year terms expiring at the 2028 annual meeting and the approval of executive compensation. The 2025 Proxy was authorized by the Board and signed by Defendant A. Grossman.

103. The 2025 Proxy represented that the Board was actively overseeing the material risks facing the Company, and that internal controls, financial reporting, and compliance matters were subject to ongoing Board and committee attention:

> The Board, acting primarily through the Audit Committee, is also responsible for oversight of our risk management practices, while management is responsible for the day-to-day risk management processes. This division of responsibilities is the most effective approach for addressing the risks facing the Company, and the Company's board leadership structure supports this approach. Through our President and Chief Executive Officer, and other members of management, the Board receives periodic reports regarding the risks facing the Company. In addition, the Audit Committee assists the Board in its oversight role by receiving periodic reports regarding our risk and control environment.

104. The 2025 Proxy further represented that the Audit Committee was actively engaged in monitoring the integrity of ADMA's financial reporting and systems of internal controls:

> The primary functions of the Audit Committee are to: (i) review the financial reports and other financial information prepared by the Company for submission to any governmental or regulatory body or the public and monitor the integrity of such

> financial reports; (ii) review the Company's systems of internal controls established for finance, accounting, legal compliance and ethics; (iii) review the Company's accounting and financial reporting processes generally and the audits of the financial statements of the Company; (iv) monitor compliance with legal regulatory requirements; (v) monitor the independence and performance of the Company's independent registered public accounting firm; and (vi) provide effective communication between the Board, senior and financial management and the Company's independent registered public accounting firm.

105. The 2025 Proxy represented that the Compensation Committee "reviews the Company's compensation practices to confirm that they do not create risks likely to have a material adverse effect on the Company," and that ADMA's compensation program was designed so as not to "encourage excessive risk-taking that could harm our value or reward poor judgment by our executives."

106. The 2025 Proxy represented that the Governance and Nominations Committee's responsibilities included "developing and recommending to the Board a set of corporate governance principles and a code of conduct applicable to the Company," and "overseeing the evaluation of the Board through annual assessment by the Governance and Nominations Committee of the performance of each member of the Board."

107. The 2025 Proxy represented that ADMA had adopted a Code of Conduct applicable to all directors, officers and employees, and that "[i]t is the policy of the Company to conduct its business in a matter that meets the highest ethical and moral standards and to strictly comply with all laws and regulations governing its operations."

108. The 2025 Proxy contained a section entitled "Certain ADMA Relationships and Related Transactions" purporting to disclose the Company's related-party transactions pursuant to Item 404 of Regulation S-K. The 2025 Proxy disclosed ADMA's historical purchases of blood collection and processing equipment from GenesisBPS (an entity founded by Defendant J. Grossman) but omitted any disclosure of ADMA's distribution relationship with Genesis Bio, the

related-party distributor controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings, as alleged herein.

109. On June 4, 2025, the Company filed a Current Report on Form 8-K with the SEC announcing, among other things, the reelection of Defendants J. Grossman and Guiheen to the Board for terms expiring at the 2028 annual meeting and the approval of executive compensation pursuant to the solicitations in the 2025 Proxy.

110. On April 15, 2026, ADMA filed its Proxy Statement with the SEC (the "2026 Proxy", together with the 2025 Proxy, the "Proxy Statements") soliciting stockholder votes on the following proposals, among others, the election of Defendants Finger and Salas as directors to serve three-year terms expiring at the 2029 annual meeting and the approval of executive compensation. The 2026 Proxy was authorized by the Board and signed by Defendant A. Grossman.

111. The 2026 Proxy made the same or substantially similar representations as the 2025 Proxy concerning the Board's and its committees' oversight of the Company's risk management, financial reporting, internal controls, compensation practices, corporate governance, and Code of Conduct.

112. The 2026 Proxy contained a section entitled "Certain ADMA Relationships and Related Transactions" purporting to disclose the Company's related-party transactions pursuant to Item 404 of Regulation S-K. The 2026 Proxy disclosed only one related-party transaction of substance — a Shared Services Agreement with Areth, the company controlled by Defendants J. Grossman and A. Grossman, under which ADMA paid Areth $120,000 in fiscal year 2025 for the lease of office and warehouse space at ADMA's corporate headquarters. The 2026 Proxy again omitted any disclosure of ADMA's distribution relationship with Genesis Bio, the related-party

distributor controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings.

113. The foregoing statements in the Proxy Statements were materially false and misleading and omitted material information. Contrary to the representations in Proxy Statements, throughout the Relevant Period the Individual Defendants engaged in a scheme to materially inflate ADMA's revenues through channel-stuffing and through the concealment of a material related-party distribution arrangement between the Company and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters. Specifically, the Individual Defendants engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations. The Proxy Statements further contained materially false and misleading statements concerning the Board and its committees' oversight over risks to the Company, the Company's corporate governance, and the Company's compensation programs.

114. On June 2, 2026, the Company filed a Current Report on Form 8-K with the SEC announcing, among other things, the election of Finger and Salas to the Board for terms expiring at the 2029 annual meeting and the approval of executive compensation pursuant to the solicitations in the 2026 Proxy.

### F. The Company's Repurchase Of Its Own Shares At Artificially Inflated Prices

115. On May 7, 2025, ADMA filed a Current Report on Form 8-K with the SEC, signed by Defendant A. Grossman, announcing that the Board had authorized a share repurchase program (the "Repurchase Program") of up to $500 million of the Company's outstanding shares of common stock:

> On May 7, 2025, the Company announced that its board of directors has authorized a share repurchase program of up to $500.0 million of the Company's outstanding shares of common stock (the "Repurchase Program"). Repurchases under the Repurchase Program may be made from time to time through open market purchases or through privately negotiated transactions subject to market conditions, applicable legal requirements, and other relevant factors. Open market repurchases will be structured to occur in accordance with the requirements of Rule 10b-18. The Company may also, from time to time, enter into Rule 10b5-1 plans to facilitate repurchases of shares under this Repurchase Program. . . . The Repurchase Program has no expiration date.

116. On March 2, 2026 — approximately three weeks before the Culper Report was released — ADMA announced that it had entered into an accelerated share repurchase agreement with JPMorgan (the "ASR Agreement"). Under the terms of the ASR Agreement, ADMA paid JPMorgan an aggregate upfront amount of $125.0 million and initially received 6,422,608 shares of ADMA common stock, representing approximately 80% of the shares expected to be repurchased under the ASR Agreement, based on the closing price of ADMA common stock of $15.57 per share on February 27, 2026. In announcing the ASR Agreement, ADMA stated that the transaction was part of a 2026 capital return initiative targeting approximately $200 million and reflected the Company's "confidence in its long-term growth trajectory." Defendant A. Grossman represented that ADMA's "common stock represents the most compelling near-term capital deployment opportunity available to the Company."

117. ADMA further disclosed in the March 2, 2026 announcement that, inclusive of prior repurchases and the ASR Agreement, ADMA would have repurchased approximately $160

million of its common stock since the Repurchase Program's authorization in May 2025. To fund the ASR Agreement, ADMA borrowed under its revolving credit facility, increasing the Company's indebtedness during the same period in which ADMA's reported revenues were materially inflated by the channel-stuffing scheme and that ADMA's distribution arrangement with Genesis Bio was concealed.

118. The Individual Defendants caused ADMA to repurchase its own shares at prices artificially inflated by the false and misleading statements alleged herein. The following table sets forth ADMA's share repurchase activity by month during the period of the misconduct alleged herein, as reported in the "Issuer Purchases of Equity Securities" disclosures in the Company's Quarterly Reports on Form 10-Q for the periods ended June 30, 2025, September 30, 2025, and March 31, 2026, and in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2025:

| For the Month Ended | Total Shares Purchased | Average Price Paid Per Share | Approximate Total Purchase Amount |
|---|---|---|---|
| June 30, 2025 | 816,237 | $18.35 | $14,977,949 |
| August 31, 2025 | 4,587 | $16.33 | $74,905 |
| September 30, 2025 | 507,824 | $15.67 | $7,957,602 |
| October 31, 2025 | 361,262 | $14.95 | $5,400,867 |
| November 30, 2025 | 229,160 | $15.27 | $3,499,273 |
| February 28, 2026 | 234,368 | $15.75 | $3,691,296 |
| March 31, 2026 | 6,519,788 | $16.37 | $106,728,929 |
| **TOTAL** | **8,673,226** | **$16.41 (WAP)** | **$142,330,821** |

### G. The Culper Report Reveals That ADMA's Reported Revenue Growth Is Premised On A Channel Stuffing Scheme And An Undisclosed Related-Party Relationship

119. On March 24, 2026, the Culper Report revealed that ADMA's reported revenue growth was "a fiction driven more than entirely by a de facto channel stuffing scheme and an undisclosed related party distributor." The Report concluded that "absent channel stuffing, ADMA

revenues declined 3% in 2025 vs. +20% reported," and that the "ASCENIV growth story is already over, and ADMA shares are headed lower."

120. Culper's investigation identified the commercial pressure that motivated the channel-stuffing scheme. ASCENIV is a plasma-derived intravenous immunoglobulin ("IVIG") product that ADMA markets on the basis of its high-titer respiratory syncytial virus ("RSV") formulation. As reported by Culper, ASCENIV carries a list price of approximately $900 per gram — a premium of roughly six to ten times the price of standard IVIG products. Notwithstanding that premium pricing, ADMA has never conducted or published a head-to-head clinical study comparing ASCENIV to any standard IVIG product, and ASCENIV accordingly carries the same standard FDA label as substantially less expensive alternatives.

121. Because ASCENIV's FDA label does not clinically differentiate the product from lower-priced alternatives, third-party payors have treated ASCENIV as functionally interchangeable with standard IVIGs, imposing strict prior-authorization requirements, step-therapy protocols, and denials of coverage. Faced with these obstacles, providers slowed their ASCENIV ordering. Real end-market demand for ASCENIV was accordingly not growing at the pace ADMA reported to investors during the Relevant Period.

122. The Culper Report cited several facts demonstrating ADMA's channel-stuffing scheme. First, ADMA's DSO expanded from 43 days as of December 31, 2024 to 113 days as of December 31, 2025, meaning that at year-end 2025 ADMA carried more than a full quarter of unpaid receivables on its balance sheet, on reported year-over-year revenue growth of 20%. Second, third-party ASCENIV sales data that Culper obtained showed ASCENIV provider sales of approximately $79 million in 2023, $175 million in 2024, and $241 million in 2025, as compared to the approximately $93 million, $240 million, and $363 million in ASCENIV revenues

that ADMA reported for the same fiscal years. The gap between the third-party sales data and ADMA's reported ASCENIV revenues thus grew from approximately $14 million in 2023 to approximately $65 million in 2024, and then to approximately $121 million in 2025, demonstrating the escalation of the channel-stuffing scheme. Third, while ADMA reported approximately $231 million in Adjusted EBITDA for fiscal year 2025, it generated only approximately $50 million in cash from operations during the same period, a divergence consistent with reported revenues reflecting uncollected receivables from distributors carrying excess inventory rather than genuine end-market sales.

123. The Culper Report further identified that two distributors, BioCare and CuraScript, accounted for approximately 73% of ADMA's consolidated revenues and 87% of ADMA's consolidated accounts receivable at December 31, 2025. That concentration meant ADMA's reported revenue growth was structurally dependent on a small number of counterparty relationships that were readily susceptible to the channel-stuffing practices.

124. The Culper Report was corroborated by first-hand accounts from persons with direct knowledge of ADMA's distribution practices:

> We spoke with two high-level employees at one of ADMA's two largest distributors, each of whom told us independently that starting in 2025, ADMA induced the distributor to stock excess ASCENIV by offering rebates and extended payment terms in order to meet order expectations. Distributors take unwanted product without having to pay for it, ADMA books the revenues, and reports growth that was never there.

125. One former high-level employee of a distributor attested that the distributor "typically had ordered once a month and kept 30 days on hand," placing a monthly order that was "adjust[ed] . . . based on the previous month's demand." But starting in mid-summer 2025, ADMA "started incentivizing us with rebates and extended payment terms to do larger orders and keep more of it on hand," and, according to that same employee, "[s]ome of those [payment] terms are

out to 120 days now." As a consequence, the distributor was carrying 4 to 6 months of ASCENIV inventory on hand, many multiples of the approximately 30-day inventory it had previously maintained under ordinary conditions. Reflecting on the practice, that employee told Culper: "[K]nowing the activity that I've been seeing, it's like cooking the books a bit."

126. A former ADMA sales representative described the same conduct: "They'll encourage them to order more to goose the channel, and then it just sits there." The Culper Report's independent third-party sales data confirmed the accumulation, revealing what Culper described as "a significant and widening gap between reported ASCENIV revenues and ultimate utilization, even as growth has slowed over time." The Culper Report estimated that "at least $200 million in ASCENIV inventory now is stuffed in the channel."

127. Culper also tested ADMA's reported ASCENIV revenues against public patient-utilization data. Referencing Defendant A. Grossman's public statement at the J.P. Morgan Healthcare Conference in January 2026 that ADMA had over 1,000 patients receiving ASCENIV, the Culper Report calculated that at typical utilization rates, ADMA's quarterly ASCENIV revenues should have been between approximately $59.4 million and $74.7 million, as compared to the approximately $104.4 million in ASCENIV revenues that ADMA reported for the same period.

128. The Culper Report also found that an undisclosed related-party distribution relationship cast substantial doubt on ADMA's financial condition:

> ADMA's problems don't end there [*i.e.*, with channel stuffing]. The Company appears to distribute ASCENIV through Genesis BioPharma Services ("Genesis Bio"), a self-described "life sciences logistics provider" that appears to be controlled by Vice Chairman Jerrold Grossman, operates out of ADMA's own corporate headquarters, and explicitly lists ASCENIV among its product offerings, yet is never named in ADMA's related party disclosures. Tellingly, ADMA discloses purchases from the similarly named but distinct GenesisBPS (an equipment provider; also Grossman-controlled but acquired by GSI in October

> 2025), but the Company has never disclosed sales to the similarly named Genesis Bio. The apparent sleight of hand is notable: by disclosing GenesisBPS and omitting Genesis Bio, ADMA creates the impression of transparency while concealing what appears to be a material distribution relationship.

129. Culper reported that it had called Genesis Bio and that the operator confirmed the number connected to Genesis BioPharma, and that Genesis Bio "refer[s] to itself as 'a division of Technomed Inc' even after the acquisition of GenesisBPS."

130. The Culper Report placed the channel-stuffing scheme and the undisclosed related-party relationship in the context of a pattern of significant departures from senior positions at ADMA:

> ADMA's 17-year auditor CohnReznick resigned in 2024 and was replaced by KPMG, who charged 3x the price, and flagged critical audit matters in both 2024 and 2025. A month after CohnReznick's resignation, long-time director Bryant Fong, who had been with ADMA prior to its 2013 IPO, resigned. ADMA agreed to immediately vest his unvested RSUs. Just one month ago, ADMA disclosed that its CFO Brad Tade would be retiring, effective immediately, at just 52 years old.

131. The Culper Report contrasted these events, and ADMA's ongoing share repurchases, with the trading patterns of ADMA's officers and directors:

> ADMA now appears to be levering up its balance sheet to fund share repurchases, reflecting supposed "confidence in its long-term growth trajectory." This confidence is apparently not shared by insiders, who have collectively sold over $50 million in stock in the past 3 years. CEO Grossman has sold over $20 million and put in place a 10b5-1 sale plan in November 2025. Further, in January 2025, Grossman pledged 712,326 shares, then worth $12.8 million at $17.97 per share, against a personal credit facility. The timing is conspicuous.

132. On this news, ADMA's stock price fell $2.26 per share, or 16.6%, to close at $11.33 per share on March 24, 2026.

133. On March 25, 2026, ADMA issued a press release addressing the Culper Report. ADMA's response characterized the Culper Report as "appear[ing] premised on speculative assertions derived from unidentified and unreliable sources," but did not specifically respond to, deny, or refute the specific allegations regarding channel stuffing or the undisclosed related-party

distribution arrangement with Genesis Bio. Following ADMA's response, ADMA's stock price fell an additional $1.70 per share, or 15%, on March 25, 2026.

134. On March 26, 2026, before the market opened, Cantor Fitzgerald downgraded ADMA stock from Overweight to Neutral, citing concerns raised by the Culper Report and ADMA's failure to specifically respond to those concerns. Cantor Fitzgerald suspended its financial model for ADMA and stated that investors were "disappointed" in the Company's response and looking for a more thoughtful response, with a stronger defense of the individual items in the Culper Report. On this news, ADMA's stock price fell an additional $1.34 per share, or 13.9%, to close at $8.29 per share on March 26, 2026.

**H. ADMA Is Sued In The Securities Class Action**

135. On June 10, 2026, the Securities Class Action was filed in this Court against ADMA, and Defendants A. Grossman, J. Grossman, and Tade, asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons and entities that purchased or otherwise acquired ADMA securities between August 9, 2024 and March 25, 2026, inclusive. As a result, the Company will incur substantial costs defending itself and its officers in the Securities Class Action and faces further substantial costs in the event of an adverse judgment.

136. The Securities Class Action alleges that the named defendants failed to disclose that: (i) ADMA had induced its distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days, through which ADMA materially inflated its reported revenues; (ii) ADMA distributed ASCENIV through Genesis BioPharma Services, an undisclosed related party controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters; (iii) ADMA's reported revenue growth for ASCENIV did not reflect sustainable end-market demand and was, in substantial part, the product of channel stuffing; (iv)

ADMA's internal controls over financial reporting were materially deficient; and (v) as a result of the foregoing, ADMA's public statements about its business, operations, and prospects, including in the 2024 10-K, the 2025 10-K, and the Company's Quarterly Reports on Form 10-Q filed during the class period, were materially false and misleading at all relevant times.

## I. Insider Trading By The Insider Seller Defendants

137. While the Company was being caused to engage in the channel-stuffing and related party distribution arrangement discussed above, the Insider Seller Defendants capitalized thereon by selling ADMA common stock while in possession of material nonpublic information concerning the channel-stuffing scheme and the undisclosed related-party distribution arrangement. Collectively, during the period of the misconduct alleged herein, the Insider Seller Defendants sold 1,612,694 shares of ADMA common stock for aggregate proceeds of $30,066,612, with Defendant A. Grossman alone selling 927,212 shares for over $16.4 million. Defendant Elms reported transactions involving 425,621 shares for gross sale consideration of over $8.8 million.

### 1. Defendant A. Grossman

138. During the period of the misconduct alleged herein, Defendant A. Grossman sold 24.5% of his ADMA common stock. This trading was a sharp departure from his prior trading history. During the 24 months preceding the scheme, A. Grossman made only two open-market sales of ADMA common stock: a cashless exercise-and-sale of 510,472 shares in August 2023 and a sale of 100,000 shares in June 2024. Those sales were dwarfed by the 927,212 shares he sold over a one-and-a-half-year period following the scheme described herein, nearly three-quarters of which were not made pursuant to a Rule 10b5-1 trading plan:

| DATE | SHARES SOLD | PRICE PER SHARE | PROCEEDS |
|---|---|---|---|
| August 26, 2024 | 236,889 | $17.69 | $4,191,088 |
| August 27, 2024 | 389,356 | $17.29 | $6,732,900 |

| | | | |
|---|---|---|---|
| November 22, 2024 | 48,967 | $21.10 | $1,033,204 |
| March 19, 2025 | 21,000 | $18.92 | $397,320 |
| April 15, 2025 | 21,000 | $21.46 | $450,660 |
| May 15, 2025 | 21,000 | $19.45 | $408,450 |
| June 16, 2025 | 21,000 | $20.81 | $437,010 |
| July 15, 2025 | 21,000 | $18.66 | $391,860 |
| August 15, 2025 | 21,000 | $16.88 | $354,480 |
| September 15, 2025 | 21,000 | $16.13 | $338,730 |
| October 24, 2025 | 21,000 | $16.00 | $336,000 |
| November 19, 2025 | 21,000 | $16.00 | $336,000 |
| December 15, 2025 | 21,000 | $19.79 | $415,590 |
| February 17, 2026 | 21,000 | $16.08 | $337,680 |
| March 16, 2026 | 21,000 | $15.16 | $318,360 |
| **TOTAL** | **927,212** | | **$16,479,331** |

**2. Defendant Elms**

139. During the period of the misconduct alleged herein, Defendant Elms sold ADMA common stock — directly and through Aisling Capital.[4] This direct trading was a sharp departure from his prior trading history. During the 24 months preceding the scheme, Elms made no open-market sales of ADMA common stock in his direct, personal capacity. Following the scheme described herein, Elms directly sold 332,680 shares over two days in June 2025 — reducing his direct holdings to only 76,441 shares — together with an additional 92,941 shares sold by Aisling Capital during the same window, none of which was made pursuant to a Rule 10b5-1 trading plan:

| **DATE** | **SHARES SOLD** | **PRICE PER SHARE** | **PROCEEDS** |
|---|---|---|---|
| June 12, 2025 (Aisling) | 92,941 | $21.69 | $2,015,890 |
| June 13, 2025 | 137,931 | $20.82 | $2,871,723 |
| June 16, 2025 | 194,749 | $20.24 | $3,941,720 |
| **TOTAL** | **425,621** | | **$8,829,333** |

**3. Defendant J. Grossman**

140. During the period of the misconduct alleged herein, Defendant J. Grossman sold 16.1% of his beneficial ownership of ADMA common stock. This trading was a sharp departure

[4] As noted previously, Elms is the designated nominee of Aisling Capital, an entity of which Elms serves as a Managing Member and through which Elms holds indirect beneficial ownership of ADMA common stock.

from his prior trading history. During the more than nine years preceding the scheme, J. Grossman made no open-market sales of ADMA common stock. Following the scheme described herein, J. Grossman sold 146,861 shares over a nine-month period, none of which was made pursuant to a Rule 10b5-1 trading plan:

| DATE | SHARES SOLD | PRICE PER SHARE | PROCEEDS |
|---|---|---|---|
| August 29, 2024 | 136,861 | $17.27 | $2,363,932 |
| June 9, 2025 | 10,000 | $21.31 | $213,100 |
| **TOTAL** | **146,861** | | **$2,577,032** |

**4. Defendant Kwon**

141. During the period of the misconduct alleged herein, Defendant Kwon sold ADMA common stock. This trading was a sharp departure from his prior trading history. During the nearly three years preceding the scheme — since joining the Board in October 2021 — Kwon made no open-market sales of ADMA common stock. Following the scheme described herein, Kwon sold 60,000 shares fifteen days into the Relevant Period, which was not made pursuant to any Rule 10b5-1 trading plan:

| DATE | SHARES SOLD | PRICE PER SHARE | PROCEEDS |
|---|---|---|---|
| August 23, 2024 | 60,000 | $18.26 | $1,095,600 |
| **TOTAL** | **60,000** | | **$1,095,600** |

**5. Defendant Guiheen**

142. During the period of the misconduct alleged herein, Defendant Guiheen sold ADMA common stock. This trading was a sharp departure from his prior trading history. During the more than nine years preceding the scheme, Guiheen made no open-market sales of ADMA common stock. Following the scheme described herein, Guiheen sold 38,000 shares over a nine-month period, none of which was made pursuant to a Rule 10b5-1 trading plan:

| DATE | SHARES SOLD | PRICE PER SHARE | PROCEEDS |
|---|---|---|---|
| September 9, 2024 | 9,000 | $18.47 | $166,230 |
| May 21, 2025 | 9,000 | $20.29 | $182,636 |
| June 9, 2025 | 20,000 | $20.96 | $419,200 |
| **TOTAL** | **38,000** | | **$768,066** |

**6. Defendant Tade**

143. During the period of the misconduct alleged herein, Defendant Tade sold approximately 42% of his vested, non-restricted ADMA holdings. This trading was a sharp departure from his prior trading history. Tade joined ADMA in June 2023 and was promoted to CFO and Treasurer effective July 24, 2024, and made no reported open-market sales of ADMA common stock during that period. Following the scheme described herein, Tade sold 15,000 shares on November 22, 2024, which was not made pursuant to any Rule 10b5-1 trading plan. Tade's retirement as CFO, effective February 25, 2026, was announced approximately four weeks before the Culper Report exposed the misconduct alleged herein:

| DATE | SHARES SOLD | PRICE PER SHARE | PROCEEDS |
| --- | --- | --- | --- |
| November 22, 2024 | 15,000 | $21.15 | $317,250 |
| **TOTAL** | **15,000** | | **$317,250** |

144. Between June 9, 2025 and June 16, 2025, J. Grossman, Guiheen, and Elms (directly and through Aisling Capital), collectively sold 588,621 shares of ADMA common stock for aggregate proceeds of approximately $11,461,043. These sales occurred approximately one month after ADMA's May 7, 2025 announcement of its first quarter 2025 financial results and the Board's authorization on that date of the $500 million Repurchase Program described in Section V.F above, and in the very month in which ADMA itself repurchased 816,237 shares of its own common stock for approximately $14,977,949 under that Repurchase Program. None of the June 2025 sales was made pursuant to any Rule 10b5-1(c) trading plan. A. Grossman's subsequent monthly sales likewise coincided with ADMA's ongoing repurchases: each of A. Grossman's sales in August, September, October, and November 2025 and February and March 2026 occurred in months in which ADMA was repurchasing its own common stock under the Repurchase Program.

## VI. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

145. Plaintiff brings this action derivatively and for the benefit of ADMA to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of ADMA and violations of Sections 10(b) and 14(a) of the Exchange Act, and SEC Rules 10b-5 and 14a-9 (17 C.F.R. §§ 240.10b-5 & 240.14a-9) promulgated thereunder, and to seek contribution for violations of Section 21D of the Exchange Act, as well as the aiding and abetting thereof.

146. ADMA is named solely as a nominal party in this action.

147. Plaintiff is, and has been at all relevant times, a stockholder of ADMA and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of ADMA in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

148. Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. The Board is neither disinterested nor independent.

### A. Demand Upon Defendant A. Grossman Is Excused

149. Defendant A. Grossman is neither disinterested nor independent. A. Grossman serves as ADMA's President and CEO. As an employee of ADMA, he receives his principal occupation and substantial compensation from the Company, including total 2025 compensation of $10,237,326. Thus, A. Grossman could not consider a demand for action that might require him to sue the directors who control his continued employment and substantial compensation, or fellow members of management with whom he works on a day-to-day basis.

150. A. Grossman is further demonstrated to lack disinterest and independence because, as alleged in Section V.B *supra*, his father Defendant J. Grossman also sits on the Board and A.

Grossman cannot consider a demand to take action against his own father with the required disinterest and independence.

151. A. Grossman is also not disinterested or independent because A. Grossman is a control person of Areth, an entity that transacts business with ADMA under a Shared Services Agreement pursuant to which ADMA paid Areth $120,000 for the year ended December 31, 2025 for office space, warehouse space, and certain related services, as disclosed in ADMA's 2026 Proxy. Under the Shared Services Agreement, ADMA occupies its current corporate headquarters pursuant to a lease with Areth extended to December 31, 2026 and automatically renewing for successive one-year periods thereafter unless either party terminates with twelve months' prior written notice.

152. A. Grossman authorized and signed the Proxy Statements, 2024 10-K, and 2025 10-K, and signed SOX certifications for the Q2 2024 10-Q, Q3 2024 10-Q, Q1 2025 10-Q, Q2 2025 10-Q, and Q3 2025 10-Q, each of which contained materially false and misleading statements and material omissions, and faces a substantial likelihood of liability therefor.

153. A. Grossman had a powerful incentive to inflate ADMA's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. During the period of the misconduct alleged herein, A. Grossman sold 927,212 shares of ADMA common stock, yielding illicit proceeds of approximately $16,479,331 while in possession of material adverse non-public information about the channel-stuffing scheme and the undisclosed related-party distribution arrangement with Genesis Bio, as detailed in Section V.H above. Thus, while in the possession of material non-public information about ADMA's ASCENIV revenue growth, financial condition, and distribution operations accomplished through the channel-stuffing scheme, A. Grossman sold ADMA stock at artificially inflated prices, reaping a material personal

benefit not shared with other ADMA stockholders from the misconduct pled herein, and he has a substantial likelihood of liability therefor.

154. A. Grossman had a further personal financial incentive to maintain ADMA's artificially inflated stock price. Pursuant to a Secured Margin Line of Credit Agreement dated January 2, 2025, A. Grossman pledged 712,326 shares of ADMA common stock—then worth approximately $12.8 million at the January 2, 2025 closing price of $17.97 per share—as security for a personal credit facility extended by JPMorgan Chase Bank, N.A., creating personal financial exposure to declines in ADMA's stock price. A. Grossman thus had a direct personal interest in inflating ADMA's stock price through the false and misleading statements alleged herein. Therefore, A. Grossman cannot consider a demand to take action against the other Board members with the required disinterest and independence.

155. A. Grossman further faces a substantial likelihood of liability for having caused ADMA to purchase 8,673,226 shares of its own common stock during the period of the misconduct alleged herein at prices artificially inflated by the false and misleading statements alleged herein, including through the March 2, 2026 accelerated share repurchase agreement with JPMorgan Chase Bank, N.A. committing $125 million of Company funds only three weeks before the Culper Report revealed the misconduct alleged herein.

156. A. Grossman, as a director of ADMA, engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of

ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations. Had A. Grossman refrained from engaging in and permitting this misconduct, the damage caused to ADMA could have been prevented or at least minimized.

157. A. Grossman is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant A. Grossman is futile and, thus, excused.

**B. Demand Upon Defendant J. Grossman Is Excused**

158. Defendant J. Grossman is neither disinterested nor independent. J. Grossman is the father of Defendant A. Grossman, ADMA's President and CEO. Further, J. Grossman is the designated nominee to the Board of Hariden, an entity of which A. Grossman is the managing member. J. Grossman owes his Board position and associated compensation to A. Grossman's continued designation of him as Hariden's nominee. Thus, J. Grossman cannot consider a demand to take action against A. Grossman with the required disinterest and independence.

159. J. Grossman further has a direct and personal financial interest in the concealment of the related-party distribution arrangement at the heart of this action. J. Grossman controls Genesis Bio, the undisclosed related-party distributor that operates out of ADMA's corporate headquarters and explicitly lists ASCENIV among its product offerings. J. Grossman is also the founder and CEO of Technomed, a wholesaler of specialty biological and pharmaceutical products of which Genesis Bio publicly describes itself as a "division."

160. J. Grossman is thus the personal financial beneficiary of the concealment alleged herein and faces a substantial likelihood of liability for breach of fiduciary duty for causing or

permitting the concealment of that arrangement from ADMA's public filings, including the 2025 Proxy.

161. J. Grossman's lack of independence and personal financial interest in the misconduct alleged herein extend beyond Genesis Bio. J. Grossman also jointly controls Areth with A. Grossman. As noted previously, ADMA paid Areth $120,000 for the year ended December 31, 2025 under a Shared Services Agreement pursuant to which Areth provides ADMA with office space for its corporate headquarters, warehouse space, and certain related services. Until GSI Group's acquisition of GenesisBPS in October 2025, J. Grossman was also the founder and President of GenesisBPS, from which ADMA historically purchased blood collection and processing equipment.

162. Each of these related-party arrangements gives J. Grossman personal financial interests in maintaining his relationship with ADMA that are irreconcilable with his fiduciary duty to consider a demand to take action against the other members of the Board with the required disinterest and independence.

163. J. Grossman benefited from the violation of Section 14(a) of the Exchange Act by securing his reelection to the Board at the June 4, 2025 Annual Meeting of Stockholders through the materially false and misleading statements and material omissions in the 2025 Proxy, and faces a substantial likelihood of liability therefor.

164. J. Grossman authorized the Proxy Statements containing materially false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

165. J. Grossman had a powerful incentive to inflate ADMA's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. During

the period of the misconduct alleged herein, J. Grossman sold 146,861 shares of ADMA common stock, yielding illicit proceeds of approximately $2,577,032 while in possession of material adverse non-public information about the channel-stuffing scheme and the undisclosed related-party distribution arrangement with Genesis Bio, as detailed in Section V.H above. Thus, while in the possession of material non-public information about ADMA's ASCENIV revenue growth, financial condition, and distribution operations accomplished through the channel-stuffing scheme, J. Grossman sold ADMA stock at artificially inflated prices, reaping a material personal benefit not shared with other ADMA stockholders from the misconduct pled herein, and he has a substantial likelihood of liability therefor.

166. J. Grossman, as a director of ADMA, engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations. Had J. Grossman refrained from engaging in and permitting this misconduct, the damage caused to ADMA could have been prevented or at least minimized.

167. J. Grossman is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant J. Grossman is futile and, thus, excused.

### C. Demand Upon Defendant Elms Is Excused

168. Defendant Elms has served as Chairman of ADMA's Board since 2012.

169. Elms authorized the Proxy Statements containing materially false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

170. Elms had a powerful incentive to inflate ADMA's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. During the period of the misconduct alleged herein, 92,941 shares were sold by Aisling Capital, and 332,680 shares were sold directly by Elms, while Elms was in possession of material adverse non-public information about the channel-stuffing scheme and the undisclosed related-party distribution arrangement with Genesis Bio, as detailed in Section V.H above. Elms is the designated nominee of Aisling Capital, an entity of which Elms serves as a Managing Member and through which Elms holds indirect beneficial ownership of ADMA common stock. Thus, while in the possession of material non-public information about ADMA's ASCENIV revenue growth, financial condition, and distribution operations accomplished through the channel-stuffing scheme, Elms caused 425,621 shares of ADMA stock to be sold at artificially inflated prices, yielding illicit proceeds of approximately $8,829,333 and reaping a material personal benefit not shared with other ADMA stockholders from the misconduct pled herein, and he has a substantial likelihood of liability therefor.

171. Elms, as a member of the Governance and Nominations Committee, had duties, among others, to develop and recommend to the Board the Code of Conduct, and to oversee the evaluation of the Board through annual assessment of the performance of each member of the Board. Elms utterly failed to perform these duties.

172. Elms, as a director of ADMA, engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations. Had Elms refrained from engaging in and permitting this misconduct, the damage caused to ADMA could have been prevented or at least minimized.

173. Elms is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Elms is futile and, thus, excused.

**D. Demand Upon Defendant Finger Is Excused**

174. Finger authorized the Proxy Statements containing materially false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

175. Finger benefited from the violation of Section 14(a) of the Exchange Act by securing her election to the Board at the June 2, 2026 Annual Meeting of Stockholders through the materially false and misleading statements and material omissions in the 2026 Proxy, and faces a substantial likelihood of liability therefor.

176. Finger, as a member of the Compensation Committee, had duties to oversee the Company's executive compensation programs, evaluate the performance of the Company's

executive officers, and confirm that the Company's compensation practices did not create risks likely to have a material adverse effect on the Company. Finger utterly failed to perform these essential duties.

177. Finger, as a member of the Governance and Nominations Committee, had duties, among others, to develop and recommend to the Board the Code of Conduct, and to oversee the evaluation of the Board through annual assessment of the performance of each member of the Board. Finger utterly failed to perform these duties.

178. Finger, as a director of ADMA, engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations. Had Finger refrained from engaging in and permitting this misconduct, the damage caused to ADMA could have been prevented or at least minimized.

179. Finger is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Finger is futile and, thus, excused.

**E. Demand Upon Defendant Guiheen Is Excused**

180. Guiheen benefited from the violation of Section 14(a) of the Exchange Act by securing his reelection to the Board at the June 4, 2025 Annual Meeting of Stockholders through the materially false and misleading statements and material omissions in the 2025 Proxy, and faces a substantial likelihood of liability therefor.

181. Guiheen authorized the Proxy Statements containing materially false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

182. Guiheen had a powerful incentive to inflate ADMA's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. During the period of the misconduct alleged herein, Guiheen sold 38,000 shares of ADMA common stock, yielding illicit proceeds of approximately $768,066 while in possession of material adverse non-public information about the channel-stuffing scheme and the undisclosed related-party distribution arrangement with Genesis Bio, as detailed in Section V.H above. Thus, while in the possession of material non-public information about ADMA's ASCENIV revenue growth, financial condition, and distribution operations accomplished through the channel-stuffing scheme, Guiheen sold ADMA stock at artificially inflated prices, reaping a material personal benefit not shared with other ADMA stockholders from the misconduct pled herein, and he has a substantial likelihood of liability therefor.

183. Guiheen, as Chair of the Governance and Nominations Committee, bore particular responsibility for developing and recommending to the Board the Code of Conduct, and for overseeing the evaluation of the Board through annual assessment of the performance of each member of the Board. Guiheen utterly failed to perform these essential duties.

184. Guiheen, as a member of the Audit Committee, had duties regarding oversight of the quality and integrity of the Company's financial statements, review of the Company's systems of internal controls established for finance, accounting, legal compliance and ethics, oversight of the Company's accounting and financial reporting processes, and monitoring the Company's compliance with legal regulatory requirements. Guiheen utterly failed to perform these essential duties.

185. Guiheen, as a member of the Compensation Committee, had duties to oversee the Company's executive compensation programs, evaluate the performance of the Company's executive officers, and confirm that the Company's compensation practices did not create risks likely to have a material adverse effect on the Company. Guiheen utterly failed to perform these essential duties.

186. Guiheen, as a director of ADMA, engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations. Had Guiheen refrained from engaging in and permitting this misconduct, the damage caused to ADMA could have been prevented or at least minimized.

187. Guiheen is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Guiheen is futile and, thus, excused.

**F. Demand Upon Defendant Kwon Is Excused**

188. Kwon authorized the Proxy Statements containing materially false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

189. Kwon had a powerful incentive to inflate ADMA's stock price through the false and misleading statements alleged herein in order to profit from insider stock sales. During the period of the misconduct alleged herein, Kwon sold 60,000 shares of ADMA common stock, yielding illicit proceeds of approximately $1,095,600 while in possession of material adverse non-public information about the channel-stuffing scheme and the undisclosed related-party distribution arrangement with Genesis Bio, as detailed in Section V.H above. Thus, while in the possession of material non-public information about ADMA's ASCENIV revenue growth, financial condition, and distribution operations accomplished through the channel-stuffing scheme, Kwon sold ADMA stock at artificially inflated prices, reaping a material personal benefit not shared with other ADMA stockholders from the misconduct pled herein, and he has a substantial likelihood of liability therefor.

190. Kwon, as Chair of the Audit Committee, bore particular responsibility for oversight of the quality and integrity of the Company's financial statements, review of the Company's systems of internal controls established for finance, accounting, legal compliance and ethics, and oversight of the Company's accounting and financial reporting processes. Kwon utterly failed to perform these essential duties.

191. Kwon, as Chair of the Compensation Committee, bore particular responsibility for overseeing the Company's executive compensation programs, evaluating the performance of the Company's executive officers, and confirming that the Company's compensation practices did not create risks likely to have a material adverse effect on the Company. Kwon utterly failed to perform these essential duties.

192. Kwon, as a director of ADMA, engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations, including in ADMA's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, and the 2025 Proxy. Had Kwon refrained from engaging in and permitting this misconduct, the damage caused to ADMA could have been prevented or at least minimized.

193. Kwon is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Kwon is futile and, thus, excused.

**G. Demand Upon Defendant Salas Is Excused**

194. Defendant Salas joined the ADMA Board on December 30, 2024, during the Relevant Period.

195. Salas authorized the Proxy Statements containing materially false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

196. Salas benefited from the violation of Section 14(a) of the Exchange Act by securing his election to the Board at the June 2, 2026 Annual Meeting of Stockholders through the materially false and misleading statements and material omissions in the 2026 Proxy, and faces a substantial likelihood of liability therefor.

197. Salas, as a member of the Audit Committee, had duties regarding oversight of the quality and integrity of the Company's financial statements, review of the Company's systems of internal controls established for finance, accounting, legal compliance and ethics, oversight of the Company's accounting and financial reporting processes, and monitoring the Company's compliance with legal regulatory requirements. Salas utterly failed to perform these essential duties.

198. Salas, as a director of ADMA, engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations, including in ADMA's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, and the 2025 Proxy. Had Salas

refrained from engaging in and permitting this misconduct, the damage caused to ADMA could have been prevented or at least minimized.

199. Salas is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Salas is futile and, thus, excused.

### H. Other Factors Demonstrating That Demand Upon The ADMA Board Is Excused

200. ADMA has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

201. The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged themselves in self-dealing.

202. Publicly traded companies, such as ADMA, typically carry director and officer liability insurance ("D&O Insurance") from which the Company could potentially recover some or all of its losses. However, such insurance typically has limited coverage for actions within the scope of this Complaint, particularly where, as here, the insured directors are the very defendants from whom the Company seeks to recover, creating an "insured versus insured" exclusion that forecloses recovery if the directors voluntarily institute suit against themselves. The Board has not even attempted to pursue a recovery of the Company's damages from the D&O carrier.

203. The acts complained of herein constitute violations of fiduciary duties owed by ADMA's officers and directors, and these acts are incapable of ratification.

204. The Board has taken no remedial action in response to the wrongdoing alleged herein: it has not terminated any officer responsible for the misconduct, has not sought to recover the incentive compensation paid to Defendant A. Grossman or Defendant Tade during the Relevant Period, has not sought to recover the proceeds of the Insider Seller Defendants' stock sales during the period of the misconduct alleged herein, has not appointed a special committee to investigate the wrongdoing, and has not implemented reforms to the Company's internal controls over revenue recognition, distribution operations, or related-party transaction disclosure.

## VII. CLAIMS FOR RELIEF

### COUNT I
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Derivatively on Behalf of ADMA Against the Individual Defendants)**

205. Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

206. During the period of the misconduct alleged herein, the Individual Defendants caused or permitted the Company to repurchase its own shares at prices artificially inflated by the misrepresentations and omissions alleged herein. The Individual Defendants caused ADMA to repurchase 8,673,226 shares of its own common stock for aggregate consideration of approximately $142.3 million, including through the March 2, 2026 accelerated share repurchase agreement with JPMorgan, under which ADMA committed an additional $125.0 million of Company funds only three weeks before the corrective disclosures alleged herein, all while the Individual Defendants were in possession of material non-public information concerning the channel-stuffing scheme through which ADMA materially inflated its reported revenues, and the undisclosed related-party distribution arrangement between the Company and Genesis Bio.

207. At all relevant times, in connection with ADMA's repurchases of its own shares, the Individual Defendants made, disseminated, or approved false and misleading statements about

the Company, omitting material information specified herein, which they knew or deliberately disregarded as false, misleading, or incomplete, intending to deceive, manipulate, or defraud. These false, misleading, or incomplete statements and the Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock. As officers and directors of ADMA, the Individual Defendants were directly responsible for and are liable for all materially false, misleading, or incomplete statements made during the Relevant Period.

208. The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts or omitting material facts necessary to make the statements not misleading, given the circumstances; and (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of ADMA common stock.

209. The Company has been damaged as a result of the Individual Defendants' violations of Section 10(b) and Rule 10b-5 by the Company's purchase of its own shares at artificially inflated prices, wasting in excess of $70 million in corporate assets when measured against the post-disclosure closing price of $8.29 per share on March 26, 2026.

210. The Individual Defendants acted with *scienter*, either intending to deceive, manipulate, or defraud, or with severe recklessness. As set forth herein, the Individual Defendants were responsible for the management, oversight, and public disclosure of ADMA's operations and financial results, had access to internal reports and information reflecting the channel-stuffing scheme and the related-party distribution arrangement with Genesis Bio, and caused or permitted the Company to execute share repurchases while that information remained concealed from the public.

211. Plaintiff brings this claim within two years of discovering the facts constituting the violation and within five years of the violation.

**COUNT II**
**Violation of Section 14(a) of the Exchange Act**
**(Derivatively on Behalf of ADMA Against the Individual Defendants)**

212. Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

213. The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, *scienter*, or recklessness with regard to this non-fraud claim.

214. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

215. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

216. The Proxy Statements were materially false and misleading because, contrary to the representations in the Proxy Statements, throughout the Relevant Period the Individual Defendants engaged in a scheme to materially inflate ADMA's revenues through channel-stuffing and through the concealment of a material related-party distribution arrangement between the Company and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters. Specifically, the Individual Defendants engaged in and permitted the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations. The Proxy Statements also contained materially false and misleading statements concerning the Board's and its committees' oversight over risks to the Company, the Company's corporate governance, and the Company's compensation programs.

217. The misleading information contained in the Proxy Statements was material to ADMA stockholders in determining whether to reelect Defendants Finger, J. Grossman, Guiheen, and Salas to the Board and to approve executive compensation.

218. The material misstatements and omissions in the Proxy Statements damaged the Company.

219. Plaintiff, on behalf of ADMA, seeks relief for damages inflicted upon the Company based on the misleading Proxy Statements in connection with the reelection of Defendants Finger, J. Grossman, Guiheen, and Salas, and the approval of executive compensation.

**COUNT III**
**Contribution Under Section 21D of the Exchange Act**
**(Derivatively on Behalf of ADMA Against the Individual Defendants)**

220. Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

221. The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

222. ADMA is named as a defendant in the Securities Class Action that alleges and asserts claims arising under the federal securities laws. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

223. As officers and directors of ADMA, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, ADMA's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

224. The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

225. The Individual Defendants have damaged the Company and are liable to the Company for contribution.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Derivatively on Behalf of ADMA Against the Individual Defendants)**

226. Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

227. The Individual Defendants owed and owe fiduciary duties to ADMA. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe ADMA the highest obligation of good faith and loyalty in the administration of ADMA's affairs. The Individual Defendants also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with their obligations, would have prevented the misconduct and consequential harm to ADMA alleged herein.

228. The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

229. The Individual Defendants each violated their fiduciary duties to ADMA and its stockholders by engaging in and permitting the misconduct alleged herein, including by: (i) causing ADMA to materially inflate its reported revenues through the channel-stuffing scheme, by which ADMA induced distributors to accept excess ASCENIV inventory in exchange for rebates and extended payment terms of up to 120 days; (ii) concealing from investors and stockholders the material related-party distribution arrangement between ADMA and Genesis Bio, an entity controlled by Defendant J. Grossman that operates out of ADMA's own corporate headquarters and lists ASCENIV among its product offerings; and (iii) making or allowing the dissemination of materially false and misleading statements concerning ADMA's financial condition, revenue growth, and distribution operations.

230. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of ADMA's affairs and the use and preservation of its assets.

231. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, ADMA has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Action and the corporate assets wasted on share repurchases at artificially inflated prices.

232. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT V**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Derivatively on Behalf of ADMA Against the Individual Defendants)**

233. Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

234. Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

235. In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

236. Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

237. Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

238. Plaintiff, on behalf of ADMA, has no adequate remedy at law.

**COUNT VI**
**Unjust Enrichment**
**(Derivatively on Behalf of ADMA Against the Individual Defendants)**

239. Plaintiff incorporates by reference and re-alleges each allegation set forth above as though fully set forth herein.

240. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ADMA, as a result of their compensation and director remuneration and the proceeds which they received as a result of their misstatements and material omissions, while breaching fiduciary duties owed to ADMA.

241. Further, the Insider Seller Defendants sold ADMA common stock while in possession of material non-public information that artificially inflated the price of ADMA common stock. As a result, the Insider Seller Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

242. Plaintiff, as a stockholder and representative of ADMA, seeks on behalf of the Company an order of this Court ordering the Insider Seller Defendants to disgorge and furnish restitution to ADMA of all profits, benefits, and other compensation obtained through their wrongful conduct and fiduciary breaches, and further ordering the Individual Defendants to disgorge all compensation received while in breach of their fiduciary duties.

243. Plaintiff, on behalf of ADMA, has no adequate remedy at law.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of ADMA, demands judgment against the Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of ADMA and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ADMA;

C. Declaring that the Individual Defendants violated Sections 10(b), 14(a), and 21D of the Exchange Act;

D. Determining and awarding to ADMA the damages sustained by it as a result of the Individual Defendants' violations, jointly and severally, together with pre-judgment and post-judgment interest;

E. Directing the Individual Defendants to account for all damages sustained and profits made as a result of their wrongful conduct;

F. Directing ADMA and the Individual Defendants to reform and improve its compliance, internal control systems, and corporate governance practices and procedures to comply with applicable laws and protect the Company and its stockholders from a repeat of the damaging events described herein;

G. Awarding to ADMA restitution from the Individual Defendants, including disgorgement of all profits, benefits, and other compensation, including insider trading proceeds;

H. Directing the Individual Defendants to contribute to or reimburse the Company for any liability or damages incurred in connection with the Securities Class Action;

I. Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J. Granting such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

Plaintiff hereby demands a jury trial.

Dated: September 2, 2026

By: _/s/ Joshua M. Rubin_

Joshua M. Rubin
**WEISS LAW**
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Telephone: (973) 470-0059
Email: jrubin@weisslawllp.com

David C. Katz
Mark D. Smilow
**WEISS LAW**
305 Broadway, 7th Fl.
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
msmilow@weisslawllp.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, Sarah Malowitzky, on behalf of the ES Trust (the "Trust"), hereby verify that the Trust is a stockholder of ADMA Biologics, Inc. ("ADMA"), having first acquired ADMA shares on June 16, 2025, and November 17, 2025, and having held ADMA shares continuously at all relevant times herein. I, on behalf of the Trust, am ready, willing, and able to pursue this stockholder derivative action on behalf of and for the benefit of ADMA. I have reviewed the allegations in the attached Verified Stockholder Derivative Complaint (the "Complaint"), and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, I believe them to be true. Having received a copy of the Complaint, and having reviewed it with my counsel, I hereby authorize its filing on behalf of the Trust.

Dated: August 27, 2026

Sarah Malowitzky, Trustee
ES Trust